**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | | 25-CR-209 (RCL) |
| | : | |
| STEPHEN KLINE | : | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Shortly after his arrest, Stephen Kline entered a guilty plea to one count of distribution of child pornography. He will appear before this Honorable Court for sentencing on February 9, 2026. The parties agree that the applicable sentencing range under the United States Sentencing Guidelines is 135 to 168 months, and there is a mandatory minimum of 60 months. The government requests a sentence at the low end of the range, 135 months. As discussed below, a review of the sentencing factors set forth in 18 U.S.C. § 3553(a) demonstrates that any term of imprisonment of more than 60 months would be greater than necessary to serve the purposes of sentencing. The Court also must impose a term of supervision and an appropriate order of restitution if requested. Counsel understands that no victims have requested restitution as of the time of the filing of this pleading.  Mr. Kline will have to register as a sex offender for 25 years. Thus, a period of supervision of 10 years is more than sufficient and no restitution should be ordered.

**Argument**

When imposing a sentence, the Court must consider the United States Sentencing Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentence disparities among defendants with similar

records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, and mental and emotional conditions. *See* 18 U.S.C. § 3661. Congress has further provided that when determining the length of any prison term, courts should "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582. With that limitation, and considering all the purposes of sentencing, the Court must impose a sentence that is "sufficient, but not greater than *necessary*, to comply with the purposes [of sentencing]." 18 U.S.C. § 3553(a).

## I. The United States Sentencing Guidelines

As the parties have agreed, the applicable Guidelines range is 135 to 168 months. However, the statutory mandatory minimum in this case is 60 months. Counsel submits that in the unique circumstances in this case, a sentence at or near the mandatory minimum would be sufficient.

The Guidelines range is based on U.S.S.G. § 2G2.2, which has been widely criticized because as applied in non-production child pornography cases, such as this case, it requires the now routine application of enhancements that were intended to apply to and differentiate the most serious child pornography offenses.  *See* United States Sentencing Commission, *Federal Sentencing of Child Pornography: Non-Production Offenses* (June 2021) ("2021 Report") at 5; *see also* United States Sentencing Commission, *Report to the Congress: Federal Child Pornography Offenses* (2012) ("2012 Report") at ii, 323. The Commission found that as a result of changes in the computer and internet technologies that typical non-production offenders use, "the existing sentencing scheme in non-production cases no longer adequately distinguishes

among offenders based on their degrees of culpability," and explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id.* at 6. The Commission found that the cumulative enhancements addressing the content and volume of images possessed, "in addition to base offense levels of 18 or 22, result[] in guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior." *Id.* at 323. *See also United States v. Henderson*, 649 F.3d 955, 960 (9th Cir. 2011) ("[T]he child pornography Guidelines were not developed in a manner 'exemplify[ing] the [Sentencing] Commission's exercise of its characteristic institutional role,' . . . so district judges must enjoy the same liberty to depart from them based on reasonable policy disagreement as they do from the crack-cocaine Guidelines discussed in *Kimbrough*."); *United States v. Grober*, 624 F.3d 592, 600-01 (3d Cir. 2010) (finding district court did not abuse discretion by imposing policy-based downward variance from § 2G2.2 because "the Commission did not do what 'an exercise of its characteristic institutional role' required—develop § 2G2.2 based on research and study rather than reacting to changes adopted or directed by Congress"); *United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010) (finding *Kimbrough*'s holding that "it was not an abuse of discretion" for a district court to disagree with the crack guidelines "because those particular Guidelines 'do not exemplify the Commission's exercise of its characteristic institutional role' . . . applies with full force to § 2G2.2."); *United States v. Stone*, 575 F.3d 83, 89-90 (1st Cir. 2009) (child pornography "guidelines at issue are in our judgment harsher than necessary" and "we would have used our *Kimbrough* power to impose a somewhat lower sentence"); *see also United States v. Grober*, 595 F. Supp. 2d 382, 397 (D.N.J. 2008), *aff'd*, 624 F.3d 592 (3d Cir. 2010) (using the offense

characteristics "to enhance the base offense level [of § 2G2.2] is irrational because logically and factually, the characteristics are simply not genuine aggravating factors. Rather, they are inherent in just about any downloading offense").

For the 2021 report, the Commission studied and reported on the facts, circumstances, and sentences for every 2G2.2 offender sentenced in the federal system in 2019. The Commission found that for distribution offenses, only 25.3% of offenders were sentenced within the Guideline Range[1], and nearly 75% of defendants received a sentence below the Guidelines, with a 65.8% pure variance rate.  Overall, the average sentence for 2G2.2 offenders (including repeated offenders) was 103 months,[2] but the average sentence for people who traded child pornography but did not engage interact with a child was 71 months.[3]  Mr. Kline's conduct is typical or less concerning than most distribution cases.  Moreover, there are also personal circumstances that suggest he is a low risk to reoffend as substantiated in the report by Dr. Keller, Exhibit 7. Thus, a sentence below the median for a distribution offense without contact with a child (71 months) is warranted.

The research continues to support the argument that 2G2.2 is fundamentally flawed. Thirteen years ago, the Second Circuit Court of Appeals examined and described an irrational "logic" that undermined the integrity of the 2G2.2 Guideline.  After reviewing all the evidence, the *Dorvee* Court found that the guideline enhancements for images involving pre-pubescent minors, the presence of more than 600 images, pictures of sadistic conduct, and the use of the computer had all become "so run-of-the-mill" as to be "all but inherent to the crime of conviction."[4]  The *Dorvee* court concluded that the methodology of "the guideline governing

---

[1] 2021 report at 23 (29 of 94).
[2] 2021 report at 5 (11 of 94).
[3] 2021 report at 44 (50 of 94).
[4] *United States v. Dorvee*, 616 F.3d 174, 186 (2d. Cir. 2010).

2G2.2" was "fundamentally different from most," because "unless applied with great care, [it] can lead to unreasonable sentences that are inconsistent with what §3553 requires."[5] These are the very enhancements that drive Mr. Kline's guideline range.

In 2012, the Sentencing Commission submitted a 468-page report to Congress agreeing with this assessment.[6] After two years of carefully studying presentence reports from around the country, the Commission reported that enhancements "originally intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders."[7] Because of technological changes in the means of viewing pornography, "by fiscal year 2010, four of the six enhancements in §2G2.2(b) – together accounting for 13 offense levels – applied to almost every typical non-production offender, and thus failed to meaningfully distinguish between more culpable and less culpable offenders."[8] Again, it is these same enhancements that apply to Mr. Kline's guideline range and drive it above the mandatory minimum.

In 2021, almost ten years after its last report, the Commission confirmed these same problems in a follow-up report to Congress. The Commission noted that many "enhancements" apply in nearly every case and provide little or no meaningful insight into either the offender's culpability or the potential risk of future harm for the community. The Commission specifically identified the following enhancements as distorting the Guideline results:

- Images of pre-pubescent children (Applied in 99.4% of cases)[9]
- Use of a computer (Applied in over 95% of cases)[10]
- The Sadistic/Masochistic or abuse of an infant or toddler enhancement (Applied in

---

[5] Id. at 182.
[6] See U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography Offenses (2012) ["Child Porn Report"].
[7] Id. at xi
[8] See U.S. Sent'g Comm'n, Report to the Congress: Federal Sentencing of Child Pornography: Non-Production Offenses (2021) ["2021 Child Porn Report] at 25.
[9] 2021 report at 31.
[10] Id. at 25.

84.0% of cases).[11]
-    The number of images enhancement (With a median number of images for non-production cases in 2019 of 4,265 images, the maximum enhancement for 600 images or more applied in 77.2% of cases).[12]
-    Distribution to another (Applied in 65.4% of cases);[13]

The Commission also reported that:

> The frequency with which these enhancements apply is fairly consistent between the non-production child pornography offense types...there is little difference between the application rates for distribution and possession offenders.  Thus, across all non-production child pornography offense types, §2G2.2 fails to distinguish adequately between more and less severe offenders.[14]

The result of applying these typical 13 levels of enhancements are that the presumptive Guideline Range is frequently as high as 210-235 months for many, if not most, first-time offenders with no history of any contact behavior.

For over a decade, the Commission has acknowledged that with these enhancements "now apply[ing] to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability,"[15] and that "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders,"[16] so that the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors."[17]  In sum, the cumulative enhancements addressing the content and volume of images possessed "result in guideline ranges that are overly severe..."[18]

---

[11] Id. at 25 and 31.
[12] U.S. Sentencing Commission "Key Findings" of 2021 report, available online at https://www.ussc.gov/research/research-reports/federal-sentencing-child-pornography-non-production-offenses#:~:text=In%20fiscal%20year%202019%2C%20non,millions%20of%20images%20and%20videos; 2021 report at 25, 30.
[13] Id. at 25.
[14] Id.
[15] 2012 report at iii, xi; id. at 209, 323.
[16] Id. at xi
[17] Id. at 323.
[18] Id.

Experts have been unified in publishing reports that advise that earlier fears about the significance of image content were grossly overstated.  Researchers found that as free images became readily available online, the images found in "collections" changed.  The "typical" child pornography case became almost exclusively composed of free internet content, such that almost all cases "included images depicting prepubescent children engaging in sexually explicit conduct."[19] A five-year study of online child porn trading revealed that the presence of "more extreme" content in the modern "typical" case, and the presence of "larger number of images" did not correlate to *either* increased deviance or criminality (i.e. dangerousness).[20]  In other words, by 2012 the Commission was already reporting that "the current guideline measures for offender culpability (e.g., for distribution of child pornography, number of images possessed, possession of sado-masochistic images) are generally not associated with significantly higher rates of [criminal sexually dangerous behavior]."[21]

That 2012 advice to Congress was confirmed by another decade of data.  The Commission's 2021 report to Congress advised that "while research had identified some correlation between viewing child pornography and other types of sex offending, most social science research suggested that viewing child pornography alone did not cause offender to commit additional sex offenses absent other risk factors."[22]

After taking into consideration all the best research of the last twenty years, in two separate reports to Congress, the Commission has provided findings that the underlying fears that non-contact offenders will recidivate or "take the next step" to molestation were grossly

---

[19] Id. at 84
[20] *See* Janis Wolak, David Finkelhor, and Kimberly Mitchell, *Child Pornography Possessors: Trends in Offender and Case Characteristics,* Sexual Abuse: A Journal of Research and Treatment, at 22, Volume 23(1)(Feb 2011), available online at http://unh.edu/ccrc/pdf/CV204%20CP%20possessors.pdf; *see* Exhibit A at Page 12,
[21] 2012 report at 204.
[22] 2021 report at 39.

overblown when Congress established the current enhancement system for these offenses and are not consistent with actual group behavior. As a group, non-contact offenders have turned-out to be strikingly amenable to treatment and supervision. After fifteen years, across multiples studies, and in two extensive reports to Congress, the Commission still maintains that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant.'"[23]

In the context of these findings, the ongoing over-incarceration driven by 2G2.2 is best illustrated by the Sentencing Commission's data for other sex offenses. The Commission noted that offenses that resulted in lower Guideline ranges than 2G2.2 included: forcible rape of a child, forcible prostitution of a child, travel to engage in sex with a child, sexual assault of a child, and statutory rape. The Commission reported the following mean sentences (for all criminal history categories and offenders) for those crimes in federal courts:[24]

- 230 months for forcible rape of pre-pubescent children;
- 173 months for raping a pubescent child;
- 155 months for forcibly prostituting children;
- 104 months for travel to engage in sex with a child 12 or older;
- 46 months for sexual assault of a child; and
- 37 months for statutory rape.

The "current guideline and statutory penalty levels are excessive or are not based on relevant factors in non-production cases."[25] For this reason, "judges have continued to sentence most non-production child pornography offenders below their guideline ranges, most often imposing variances pursuant to 18 U.S.C. § 3553(a)." June 2021 Report at 3.

---

[23] 2012 Report. at 278 & n.31 (quoting Center of Sex Offender Management, The Comprehensive Approach to Sex Offender Management 5 (2008)), and at 119-122.
[24] Id. at Table 6-6
[25] 2012 report at 213.

As noted above, several of the offense level enhancements that have been criticized for no longer serving the purpose of differentiating between offenders have substantially increased the advisory range for Mr. Kline. These are: § 2G2.2(b)(6) (adding 2 levels for use of a computer) and § 2G2.2(b)(7) (adding 4 levels for the number of images). Together, these enhancements more than double the advisory range, increasing it from a range of 70 to 87 months (at offense level 27) to a range of 135 to 168 months (at offense level 33). These enhancements do not differentiate between offenders or support a finding that Mr. Kline's offense requires more than the mandatory term of 5 years.  Moreover, the number of images Mr. Kline possessed is actually quite small – he was not a collector as is often the case. The higher number is driven by the fact that he possessed 5 videos. The 5 videos are rather arbitrarily considered 375 images and when added to the 2 images he distributed, amount to a total of 377 images – the low end of the 300 to 600 images that require a 4-level enhancement.

In addition to these enhancements, the guidelines in Mr. Kline's case are raised a full 6 levels because the content included prepubescent minor and toddler. While the images are disturbing, they rachet the guidelines up from a level 24 which encompasses the mandatory minimum even before acceptance of responsibility to a level 30. As the Commission has noted, "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id.* at 6. This has resulted in "guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior." *Id.* at 323. Thus, while the parties agree on the application of the guidelines, those guidelines are not mandatory and, in this case, overstate the need for

incarceration beyond the statutory mandatory minimum in what is really a run-of-the-mill distribution case of an individual with a very low risk of recidivism and no criminal history. enhancements apply in the majority of 2G2.2 cases. In other words, the "aggravating" nature of the image files in this case, while morally repugnant, are, in fact, typical of these cases, and are therefore not something which differentiates him as deserving a higher sentence than other like offenders.

## II. History and Characteristics of Mr. Kline

As noted in the PSR, Mr. Kline has no criminal history whatsoever. Not only no juvenile or adult convictions, but no arrests whatsoever. He is a 40-year-old man who has never even had a traffic offense. He has been gainfully employed his entire life in a history of jobs with increasing responsibilities. And he didn't come by this easily. Mr. Kline's childhood was marked by trauma which has caused ongoing mental health symptoms that Mr. Kline has acknowledged and indeed, sought treatment for, but ultimately abandoned to focus on others instead of himself. He recognizes the need to address his childhood trauma and to address his ongoing mental health by seeking treatment and has begun that process while incarcerated. As discussed below, he has done everything in his power during his time in custody at Northern Neck Regional Jail to begin the process of healing and rehabilitation.

A comprehensive psychosexual evaluation and risk assessment was completed by Shauna Keller, a clinical neuropsychologist and certified sex offender treatment provider. See Exhibit 7, Psychosexual Evaluation. She interviewed Mr. Kline, reviewed the relevant records (including but not limited to the criminal complaint, PSR, Government's Memorandum in Aid of Sentencing, Plea paperwork, and relevant discovery) and assessed his risk of reoffending. *Id.* Using the Child Pornography Offender Risk Tool (CPORT), she scored him at a zero, indicating

a very low risk of reoffending. Her report is incorporated into this sentencing memorandum with excerpts cited below.

Mr. Kline was born to Robert Kline and Linda Fosberg who were married at the time but separated when he was only about 5 years old. The divorce was in large part because of his mother's struggles with addiction. His mother retained primary custody of him, but he spent time with both parents, each of whom remarried multiple times with differing effects on him.  His mother's second husband was physically abusive to his mother and his father's second wife was emotionally abusive to him. As described in the psychosexual evaluation,

Mr. Kline recalled early memories of feeling loved by his mother, but described his childhood as marked by fear, confusion, and instability due to exposure to domestic violence and neglect. Following his parents' divorce, he witnessed his mother being physically assaulted by multiple partners, including Tim. Mr. Kline stated, "She tried to stop it or get me to go away, so I wasn't exposed to it… I will never forget watching Tim beat my mom; I was so scared, and I didn't know what to do; I was seven." When Mr. Kline was eight years old, his mother and Tim separated, and she entered a six-month drug rehabilitation program. During that time, Mr. Kline lived with his father for approximately one year before returning to his mother.

At the age of nine, Mr. Kline returned to live with his mother, who was sober and residing in an apartment. Shortly thereafter, she relapsed, and he became aware of her substance use, though he did not understand its severity. "Between the ages of nine and 13, he experienced chronic fear and uncertainty because he was often left alone while his mother obtained drugs. He recalled, "One time, the police showed up when she didn't pay for a taxi, and since then, she began taking me with her to get drugs. She would leave me in the car while she ran in, and I remember being scared and hiding under the dash. I told her about it, and she eventually began taking me into the buildings… It was scary."

Following these experiences, Mr. Kline reported that he continued to accompany his mother several times per week for approximately another year, until she lost the apartment and their vehicle became inoperable.

During the fifth and sixth grades, Mr. Kline reported increased awareness of the instability associated with his mother's substance use, including her fabrication of a cancer diagnosis and deceptive behaviors to obtain money from his grandmother. He described being largely responsible for himself, including preparing meals and getting to school independently, as his mother was frequently absent or asleep. Mr. Kline reported feeling persistently alone and unsupported at home and school, with increasing self-

consciousness about his appearance, lack of lunch money, and anxiety regarding his school performance.

Although Mr. Kline continued visiting his father regularly, he reported that his father was unaware of the extent of his mother's substance use or the conditions he faced, as Mr. Kline did not disclose them. After being retained in the sixth grade and becoming increasingly aware of the instability in his mother's household, he requested to live with his father full-time, despite reporting that the decision was difficult and that he did not want to leave his mother. His mother subsequently entered residential treatment for approximately one year, while Mr. Kline continued to reside with his father and his father's third wife, Barbara, whom he described as "like a mom" to him.

Following completion of rehabilitation in 1999, Mr. Kline's mother married her third husband, Charlie, whom Mr. Kline recalled positively, stating, "He taught me a lot and loved me. He included me in stuff, and we went on vacations together." He reported that his mother later used alcohol to cope with marital discord, which led to Mr. Kline, then 17, admitting her to a rehabilitation program, which she successfully completed.

Exhibit 7, Report at 5-6.

His childhood exposure to parental substance abuse, domestic violence and chronic

instability left him feeling scared, insecure, emotionally unsupported and unloved. This was

internalized as loneliness and emotional distress. Dr. Keller reported

Mr. Kline described a developmental history marked by early and prolonged exposure to adverse childhood experiences, including parental substance use, domestic violence, emotional and physical neglect, and housing instability. These conditions resulted in chronic fear, confusion, and emotional insecurity throughout childhood and contributed to an early reliance on emotional avoidance and self-containment as primary coping strategies. Specifically, Mr. Kline developed a flight-based response characterized by suppression of emotional distress and avoidance of disclosure out of fear of rejection or abandonment.

Throughout his youth, Mr. Kline's father served as a meaningful protective buffer, and residing with him during a period of heightened emotional vulnerability provided increased stability and security. However, because his earlier traumatic experiences remained largely unprocessed, this protective environment also reinforced emotional avoidance rather than emotional integration (van der Kolk, 2005). Consequently, when triggered—particularly within intimate or emotionally salient relationships—this pattern is associated with intensified distress, heightened sensitivity to perceived rejection, and activation of a self-deprecating internal narrative, increasing vulnerability to maladaptive coping responses (Howard et al., 2023).
In the period preceding the instant offense, this longstanding defensive pattern appeared to become destabilized by the convergence of relational and occupational stressors. Mr.

12

Kline described increasing emotional distance within his marriage, which, when combined with escalating work-related demands and associated loneliness, triggered trauma-related themes of being unwanted and unloved. This activation was accompanied by the emergence of prominent depressive symptoms that became increasingly difficult to regulate. In the absence of more adaptive coping strategies, Mr. Kline became more inclined to engage in self-gratifying and problematic behaviors that provided short-term emotional relief despite foreseeable long-term consequences, including high-risk sexual behaviors (Gewirtz-Meydan et al., 2025; Tull & Gratz, 2013). In this context, Mr. Kline's engagement in solitary and online sexual behaviors functioned as an affect-regulation strategy and contributed to impaired judgment, culminating in the instant offense.

Exhibit 7.

The trauma and the effects of drug addiction didn't stop after his childhood. Mr. Kline had a half-brother, Richard who struggled with drug addiction. While they were close as children and Richard lived with Mr. Kline for a period of his adult life, when Richard relapsed and began using and stealing to support his habit, Mr. Kline had to ask him to leave. Shortly thereafter, Richard died from a drug overdose and Mr. Kline regrets not being able to help him and suffers from internalized guilt.

Later in life his adult relationships also suffered from his feelings of inadequacy and concern about being rejected. He suffered from prominent depressive symptoms and sought assistance from mental health providers. However, he was not consistent with mental health treatment because of occupational and family demands. Regrettably, it was during this time that he turned to adult pornography and "increasingly maladaptive and transgressive" behavior. Exhibit 7, Report at 6-7.

The childhood instability also had an impact on his education – he moved from school to school and suffered from the lack of support and the feeling of isolation and neglect. Despite this, he was able to complete his education and has had a history of successful employment.

Immediately upon his arrest in this case Mr. Kline acknowledged his wrongdoing and indicated a strong desire to accept responsibility for his actions and attempt to make amends. The criminal conduct occurred over a short span of time – from June 26, 2025, to July 2, 2025, when he was arrested. When he appeared in the District of Columbia he agreed to be detained and immediately sought to work out a plea. While an indictment was sought, it was after he had already indicated through counsel an intent to waive detention and a preliminary hearing and to plead guilty. The indictment was returned on July 25, and he pleaded guilty shortly thereafter. The only delays were the result of counsel's unavailability in August and difficulties that arose because of his incarceration outside of the District of Columbia. His very early and complete acceptance of responsibility should be credited.

Despite the nature of the charges, since his detention, Mr. Kline's family has been very supportive. Through regular phone calls, Mr. Kline has developed a close relationship with his mother, ex-wife, children and other family members, who will all support him through his sentence and recovery. He also has the support of former coworkers and friends. See Exhibit 4, Letters of Support.

The time Mr. Kline has spent at the jail and the time he has been away from his family has been difficult and has made a lasting impression. In part due to the charges against him, his time there has been particularly challenging. Nonetheless, he has tried to be productive. He has completed numerous in online educational courses. See Exhibit 5, Transcript, and Exhibit 6, Certificates. He has completed more than 50 courses, at least 16 of which focused on personal insight, behavioral change, and recovery. Exhibit 7, Report at 7.

In addition to taking educational courses and building stronger relationships with the people in his life, Mr. Kline has developed a relationship with God. He attends bible studies and

reads the scriptures and prays regularly. As Dr. Keller noted,

> Mr. Kline reported greater awareness of how childhood trauma shaped his emotional and behavioral responses as an adult. He said, "I truly feel that believing I was unwanted and unloved led to what happened [instant offense]. … I learned how to forgive my mom, myself, and the guilt for my brother's death. I feel like I am in a good place now emotionally." Mr. Kline also learned healthier coping strategies in these programs, including journaling, meditation, and Christianity, which he uses to stay focused during stress and anxiety, stating, "It helps me release the things I can't control. I do Bible study every night."

Exhibit 7, Report. Perhaps most importantly, Mr. Kline has spent time reflecting on his childhood, the trauma he endured, the affects his actions have had on others, and has gained insights that will help his rehabilitation. The letter he wrote to his mother, Exhibit 3, and the letter he wrote to the Court, Exhibit 1, best reflect this greater insight.

For all these reasons, Mr. Kline's history and characteristics support a finding that a 5-year sentence is sufficient to serve the purposes of punishment and deterrence, while providing the necessary treatment.

## III. The Nature and Circumstances of the Offense.

There is no doubt that the distribution of child pornography is a very serious offense that causes significant further harm to the children depicted in the images possessed and distributed. The mandatory minimum 5-year term fully accounts for the nature and circumstances of the offense. While the offense is very serious and Mr. Kline recognizes the need for punishment, as noted above, the guidelines overstate the relative culpability of Mr. Kline. In this case, the criminal conduct occurred over a short span of time – from June 26, 2025, to July 2, 2025, when he was arrested. There was no evidence of other criminal conduct and Mr. Kline was immediately remorseful and prepared to accept the consequences of his actions. The distribution of CSAM was limited in quantity to just 5 videos and 2 images, and while the nature of the images were disturbing, those images were regrettably widely available on the internet.

Dr. Keller commented in her report on how open Mr. Kline was in discussing his life and his criminal conduct in this case. Her report best describes the nature and circumstances of the offense and how and why it occurred. She noted that

> Mr. Kline was introduced to the incest genre through discussion and engagement in role-play. He subsequently joined incest-themed groups on FetLife, where members discussed their sexual preferences in the context of their life experiences. Mr. Kline stated, "There were a lot of people that experienced the same day-to-day stresses as I did," and the nonsexual relatability of personal experiences was what drew him to the group. He acknowledged taking part in the incestual roleplays under the "dad" persona. Mr. Kline reported that his involvement in the roleplays facilitated a sense of connection with other group members through relationships based on shared and simulated experiences. He further reported that the intimacy generated through these roleplays fulfilled longstanding emotional deficits from childhood—specifically feeling wanted, loved, needed, and cared for—which he experienced as emotionally gratifying and sexually arousing.

> Approximately two months after joining FetLife and becoming involved in the incest groups, Mr. Kline began communicating with a member via Session. During one conversation, he first encountered child sexual abuse material (CSAM) after an image was sent to him. He stated, "I immediately did not care for it; it was not what I wanted, and I said I wasn't interested in that. I stopped talking to that particular person for about a week, but I missed the relationship. I reached out to that person, and we continued talking about the incest fantasy." In later conversations, the individual sent a second image depicting what appeared to be a naked 16-year-old female.

> Thereafter, many of the role-plays involved adolescent females, which he described as, "That was intriguing because it was something new and more acceptable because she was a teenager and developed." He reported that it was his engagement in these online conversations and exposure to CSAM that ultimately led to his involvement in the instant offense and subsequent conviction of Distribution of Child Pornography.

Exhibit 7, Report.

Importantly, as described by Dr. Keller,

> There is no indication that Mr. Kline exhibited a pervasive sexual interest in or preference for prepubescent or pubescent females prior to the instant offense. According to the PSR, law enforcement extracted Mr. Kline's devices and found that he had engaged in online conversations regarding the sexual abuse of children, including distributing non-CSAM photographs of his stepdaughter during some exchanges. The timeframe of these communications was not initially specified. Mr. Kline's engagement in these non-normative online behaviors appears to have emerged in the context of persistent loneliness and depressive symptoms beginning in 2023.

Available information suggests that Mr. Kline's primary motivation for participating in nonnormative sexual dialogues was the pursuit of emotional connection rather than sexual interest in minors. Mr. Kline did not report an ongoing pattern of such dialogues or use of CSAM for sexual gratification, nor is there evidence that he attempted to meet anyone in person to commit sexual abuse. While involvement with fictional sexual stories or CSAM is deviant and could suggest a pedophilic interest, "such behavior in the absence of the individual's sexual interactions with children (i.e., acting on these sexual urges in person) is insufficient to conclude that Criterion B [for Pedophilic Disorder] is met" (American Psychiatric Association, 2022, p. 793).

According to the Statement of Facts, Mr. Kline's online interactions involving CSAM occurred between June 26, 2025, and July 2, 2025. This short duration and the limited amount of child sexual exploitation material involved—5 videos and 2 images—do not indicate a persistent sexual interest in minors. Individuals with more extensive collections of child sexual exploitation material are more likely to demonstrate such a pattern. Based on the available information and consistent with DSM-5-TR criteria, Mr. Kline does not meet the diagnostic criteria for Pedophilic Disorder.

Exhibit 7, Report at 14.

Most importantly, Mr. Kline presents as a person unlikely to recidivate and very likely to succeed on supervision. Since his arrest, he has demonstrated emotional stability and has "largely regulated and adaptive coping strategies in place (e.g., journaling, meditation, religious practices, CBT-informed strategies)." Exhibit 7, Report.  Dr. Keller reports that "Mr. Kline demonstrates adaptive functioning in work, family, and social relationships, reflecting resilience and prosocial engagement. His history suggests that mood-related dysregulation arises primarily in the context of stress or perceived interpersonal neglect, highlighting the situational nature of his difficulties rather than a pervasive psychiatric disorder." She found that his sexual history is not indicative of hypersexuality and that his "periods of increased solitary sexual activity occurred in the context of mood disturbance and functioned as a coping response rather than a pervasive pattern of sexual preoccupation or compulsive sexual behavior." Exhibit 7, Report. For all these reasons, she concludes that his risk of reoffending is very low.

**IV. Purposes of Sentencing.**

The Court must impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offender affords adequate deterrence, and protects the public. Under the circumstances of this case, the mandatory minimum term of 60 months is more than sufficient to serve these purposes.

Mr. Kline also must register as a sex offender, with the publication of the information about this case to the community and his friends and neighbors. This sex offender designation will effectively make him a societal outcast for the many years following his release, making finding employment and housing extremely difficult. As several courts have recognized, collateral consequences of a conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment. *See, e.g., United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after *Gall*, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," *id.* § 3553(a)(2)(A), and "adequate deterrence," *id.* § 3553(a)(2)(B)); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress because of prosecution).

The 5-year mandatory minimum will also serve as a substantial deterrence and no greater

term is necessary to do so. The empirical evidence demonstrates that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime and Justice: A Review of Research 2829 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug  Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The 2021 Report from the Sentencing Commission demonstrates that offenders charged with non-production child pornography offenses are far less likely to recidivate than offenders charged with other offenses. In the 2021 Report, the Commission found that non-production child pornography offenders had a recidivism rate of 27.6%. 2021 Report at 65. By comparison, the Commission has found that offenders charged with firearm offenses have a 68% recidivism rate; drug traffickers have a 50% recidivism rate, and those charged with fraud have a 34%

recidivism rate. *See https://www.ussc.gov/sites/default/files/pdf/research-and-publications/backgrounders/rg_recidivism-series.pdf.*

The Sentencing Commission also has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (2004). According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). Nor does lengthy imprisonment of child pornography possessors have any deterrent or preventive effect on the production or dissemination of child pornography. There is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." *Beiermann*, 599 F. Supp. 2d at 1103-04 ("[W]e cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."). The Sentencing Commission acknowledges that there is no social science research supporting the theory that criminal punishments "have affected commercial or non-commercial 'markets' since the advent of the Internet and [peer to peer] file-sharing." 2012 Report at 98.

A primary assumption underlying Congress's actions with respect to the child pornography guideline has been that possessors of child pornography are likely to sexually abuse children. This belief is contrary to the empirical research. In the 2021 Report, the Sentencing

Commission found that the percentage of child pornography offenders released from incarceration or placed on probation in 2015 that were rearrested for a sex offense within three years was a little as 4.3%. 2021 Report at 7. *See also* Helen Wakeling et al., *Comparing the Validity of the RM 2000 Scales and OGRS3 for Predicting Recidivism by Internet Sexual Offenders*, 23 Sexual Abuse: J. Res. & Treatment 146, 164 (2011) (child pornography offenders "do not, as a group, present a significant risk of escalation to contact sexual offenses."); Jérôme Endrass et al., *The Consumption of Internet Child Pornography and Violent Sex Offending*, 9 BMC Psychiatry 43 (2009) (study that followed 231 child pornography offenders for six years after initial offenses found that only two offenders (0.8%) committed a contact offense, and only nine offenders (3.9%) committed a non-contact sexual offense, and concluded that "the consumption of child pornography alone does not seem to represent a risk factor for committing hands-on sex offenses . . . at least not in those subjects without prior convictions for hands-on sex offenses"); Michael C. Seto & Angela W. Eke, *The Criminal Histories and Later Offending of Child Pornography Offenders*, 17 Sexual Abuse 201, 207-08 & tbl. III (2005) (finding that 1.3% of those who had committed child pornography offending only recidivated with contact sex offenses; "our finding does contradict the assumption that all child pornography offenders are at very high risk to commit contact sexual offenses involving children."); L. Webb et al., *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 463 (2007) (finding Internet-only offenders "significantly less likely to fail in the community than child molesters," and concluding that "by far the largest subgroup of internet offenders would appear to pose a very low risk of sexual recidivism"). As one district court put it, "the empirical literature [] generally concludes that there is little—if any—evidence of a direct correlation between viewing child pornography and the viewer's commission of

'contact' sexual offenses." *United States v. Marshall*, 870 F. Supp. 2d 489, 492 (N.D. Ohio 2012), *aff'd*, 736 F.3d 492 (6th Cir. 2013). While sex offenders who commit violent sexual offenses against children have higher recidivism risks, child pornography offenders do not.

Moreover, research indicates that lengthy sentences alone have limited deterrent value for sexually motivated crimes, as such offenses are often driven by compulsive, emotional, or cognitive distortions rather than rational cost-benefit decision-making, making the certainty of detection and access to treatment more influential factors than sentence severity alone. As noted, the National Institute of Justice emphasizes that certainty of being caught is a far stronger deterrent than the severity of punishment, and that longer prison terms produce only a limited marginal deterrent effect while generating substantial social and economic costs.[26] This is even more true for sex offenses. Research specifically focused on sexual offenses finds that trends toward longer sentences and increased incarceration have not demonstrably addressed the root causes of sexual violence nor clearly produced reductions in sexual offending.[27] Taken together, these findings suggest that longer sentences do not reliably deter a broader population of potential offenders from committing similar sexually motivated offenses and that evidence-based strategies emphasizing certainty of enforcement, intervention, and rehabilitation are more likely to enhance public safety.

---

[26] National Institute of Justice on deterrence found at https://nij.ojp.gov/redirect-legacy/fivethings/Pages/deterrence.aspx.

[27] The Sentencing Project report on sexual crime sentencing and recidivism trends, found at https://www.sentencingproject.org/policy-brief/responding-to-crimes-of-a-sexual-naturewhat-we-really-want-is-no-more-victims/.

And perhaps more important than the general studies, here the psychosexual evaluation conducted by Dr. Keller supports the conclusion that Mr. Kline does not present a high risk of recidivism. She found that he is amenable to treatment:

> Mr. Kline discussed the behavior that underlies the instant offense. His account of the offense behavior was consistent with official accounts. Mr. Kline displayed credible remorse while discussing these matters. When asked about the CSAM discovered on his devices, Mr. Kline stated that the files had been uploaded by another user in the Session application and that he had forwarded them in an effort to establish credibility so the person would be willing to communicate. Within this evaluation, Mr. Kline genuinely appeared to consider his sexual interests and behaviors as they related to his online sexual interactions, including the sexual dialogue he had with the UC.Mr. Kline reported he was willing to participate in sex offender-specific treatment to address his online sexual behavior. His ability to self-reflect and his candidness about his sexual behaviors demonstrate his motivation to change and a willingness to experience discomfort to bring about personal changes.

Exhibit 7, Report.

With respect to his risk of reoffending, Dr. Keller used the Child Pornography Offender Risk Tool (CPORT) Version 2 while noting its limitations. As she describes, the best way to assess risk is to gather factual information about the offenders' personal and criminal history and then compare that to the proportion of the individuals expected to have the same score.  On the CPORT, Mr. Kline scored 0 out of 7 points. No risk factors were identified during CPORT scoring. The observed percentages from the combined normative dataset indicate that 0% of individuals had a lower CPORT score, 18% had the same score, and 82% had a higher CPORT score than Mr. Kline. He scored zero because he was not young at the time of the first offense he has no prior criminal history and no known history of contact sexual offending, other than the offense conduct, there is no indication of a persistent sexual interest in children, no exhibition of behaviorally significant antisocial characteristics. Additionally, Dr. Keller noted that important factors to consider are an offender's ability to maintain secure intimate

relationships and that while his wife has filed for divorce, he has otherwise been able to maintain

stable relationships. She found "no clinically significant concerns in the following areas:

Significant Social Influences, Emotional Identification with Children, Hostility Toward Women,

General Social Rejection, Lack of Concern for Others, Impulsive Acts, Poor Problem-Solving

Skills, Negative Emotionality, Sex Drive/Sex Preoccupation. To the contrary, she found

prominent factors that tend to mitigate the risk of reoffending, including "the absence of a

generally antisocial or criminal lifestyle and a history of compliance with

authority." She noted that his ability to maintain employment and financial responsibility, his

positive support system, his abstinence from drug and alcohol use, and his increased insight

into the correlation between his use of sexual activity as a coping strategy to

numb the negative emotions he experienced as well as his motivation to engage in necessary

mental health and sex offender treatment all portend a positive future.

## V.  The Need to Avoid Unwarranted Disparities.

The Court must consider the "need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct." 18 U.S.C.

§ 3553(a)(6). "Unwarranted disparity is defined as different treatment of *individual* offenders

who are similar in relevant ways, or similar treatment of *individual* offenders who differ in

characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen

Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice

System Is Achieving the Goals of Sentencing Reform* 113 (2004).

According the 2021 report to Congress, federal courts sentenced all 2G2.2 offenders to a

mean (average) sentence of 103 months with a median (the point at which half of all sentences

are lower and half are higher) of 84 months.[28]  Those numbers include 159 defendants who had

prior sex offense convictions requiring mandatory minimum enhancements of ten years' or more.

Of this total pool of non-production offenders, about 30% had engaged in a contact sex-offense

associated with their case,[29] and nearly 20% more had engaged in some form of non-contact

sexual offenses with minors (such as swapping nude pictures with a minor).[30] Finally, these

average and median sentences also included all Criminal History Categories from I to VI.    In

other words, Mr. Kline's conduct is far less severe than a significant portion of these offenders,

for whom the median sentence was 84 months.

The Sentencing Commission collected some additional data to try to help courts better

differentiate between offenders in this group.  In the 2021 report to Congress, the Commission

provided data on § 2G2.2 defendants who a) had no actual or remote interactions of any kind

with a minor, but b) who engaged in "community activity," such as swapping pictures with other

adults. This group included offenders of all Criminal History Categories.  For offenders overall,

courts imposed a below-guidelines variance in 69.7% of cases.[31]  This average has been

consistent over time.  Looking back to 2016 for instance, for the entire pool of first-time

offenders, we find a median sentence of 72 months (even though nearly 1/3 of that 2016 group

had engaged in some form of CSDB behavior).[32]  In other words, no matter which data set we

look to, more than half of all offenders get sentences of 71 months or lower, even though a

majority of these offenders' misconduct included all the same factors as Mr. Kline's case or

worse.  In fact, 53% of these offenders were historically allowed to plead to offenses without a

---

[28] 2021 Report at 44.
[29] 2021 Report at Page 42.
[30] Id. at 43.
[31] Id. at 45.
[32] *See, e.g.*, Sentence Lengths for Offenders in Each Criminal History Category by Primary Sentencing Guideline, Fiscal Year 2016.

mandatory minimum, permitting many of them to get sentences below 60 months.

Because of the specific individual characteristics of Mr. Kline, there is every reason to believe that he has learned from this lesson and will do well on release. A sentence significantly more lenient than the average of 71 months is therefore warranted. Dr. Keller's report as well as Mr. Kline's letter and the letters from his family and friends support a conclusion that Mr. Kline is not a particular danger to society going forward and we can expect him to conform his behavior to the expectations of his probation officer upon release. There is therefore no reason to give him a more significant sentence than comparable defendants, the majority of whom receive a sentence either at or near the mandatory minimum.

As the Court is well aware, 18 U.S.C. § 3553(a)'s parsimony provision requires the court to impose a sentence that is sufficient but not greater than necessary to achieve sentencing goals, two of which are to avoid unwarranted sentencing disparities and promote respect for the law. A 60-month sentence in prison plus additional registration as a sex offender upon release are significant punishments. A five-year sentence acknowledges the value of Mr. Kline's positive qualities and past contributions, while holding him publicly accountable for his crime. Here, the statute requires the mandatory minimum term of 60 months and sentencing statistics demonstrate that any greater sentence would constitute an unwarranted disparity. As the statistics submitted by the Probation Office demonstrate, sentencing Mr. Kline to more than the required 60 months would create an unwarranted disparity.

## VI. Restitution

As the government recognizes, the Court must "order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses." *Paroline v. United States*, 572 U.S. 434, 458 (2014). To date, there has been no

26

request for restitution and thus none should be awarded.

## Conclusion

For the foregoing reasons, Mr. Kline respectfully requests the Court impose the mandatory minimum 5-year term of incarceration, followed by a 10-year term of supervised release.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____

Michelle Peterson
Chief Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004