SHAUNA KELLER, PSY.D.

PRECISION NEUROPSYCHOLOGY, PLLC

Telephone: 202.670.6757                                                                 shauna.keller@klrforensics.com

January 27, 2026

Michelle Peterson, Esq.
First Assistant Federal Public Defender
Office of the Federal Public Defender
625 Indiana Avenue, NW, Suite 550
Washington, DC 20004

      Re:    *United States v. Stephen Kline*
              *Case No.: 1:25-CR-209-RCL*

Dear Ms. Peterson:

Pursuant to your request, I conducted a comprehensive psychosexual evaluation and risk assessment of your client, Stephen Kline. The purpose of this evaluation was to examine psychological, behavioral, and historical factors relevant to Mr. Kline's offense behavior, assess his risk for sexual reoffending, and identify any clinically indicated treatment needs.

The evaluation with Mr. Kline was conducted at the Northern Neck Regional Jail in Warsaw, Virginia, on December 11, 2025, for a total of 3.5 hours. On that occasion, I conducted an extended clinical interview and obtained information regarding Mr. Kline's past and current circumstances sufficient to code the items of the Child Pornography Offender Risk Tool (CPORT) for his case (see below). In addition to these procedures, I reviewed information from the following sources:

1. Presentence Investigation Report, Draft and Final, December 15, 2025; January 5, 2026
2. Government's Memorandum in Aid of Sentencing, January 12, 2026
3. Statement of Facts, October 7, 2025
4. Indictment, July 25, 2025
5. Commitment to Another District, U.S. District Court for the Eastern District of Pennsylvania, July 3, 2025
6. Criminal Complaint and Affidavit in Support of Criminal Complaint; Arrest Warrant, July 2, 2025
7. Electronic Communications and Investigation Documentation, Federal Bureau of Investigation, date range of documents: July 2, 2025 – August 27, 2025
8. Course Transcript, Northern Neck Regional Jail,
9. Mr. Kline's Letter to Judge Lamberth, January 3, 2026
10. Linda Fosburg to Judge Lamberth, December 20, 2025
11. Mr. Kline's Letter to his mother, Linda Fosburg, September 6, 2025

<u>NON-CONFIDENTIALITY WARNING</u>: At the beginning of my interview with Mr. Kline, I explained the non-therapeutic nature of my role as a forensic evaluator, the type, purpose, and scope of the requested evaluation, and the relevant limits of confidentiality and privilege. He was

informed that the information obtained from this interview and evaluation was not confidential and might be included in a report submitted to his attorney and, potentially, the Court. Additionally, I informed Mr. Kline that I could be ordered to testify in court about this evaluation. Mr. Kline indicated that he understood these explanations and cooperated fully with the evaluation process.


**IDENTIFYING INFORMATION**

Stephen Kline, a 40-year-old male, is before the United States District Court for the District of Columbia on one count of Distribution of Child Pornography §18 U.S.C. 2252(a)(2), and has entered a Guilty plea under the terms of a plea agreement with the Government. According to the Statement of Facts, a task force officer with the FBI Washington Field Office was acting in an undercover capacity (UC) as part of the Child Exploitation and Human Trafficking Task Force. As part of a law enforcement operation, the UC entered a social media platform that is known to cater to individuals who have an interest in alternative sexual practices and fetish-related content.

On June 26, 2025, a user of that platform, later identified as Mr. Kline, sent a message to the UC through the platform's private messaging feature. On June 30, 2025, Mr. Kline and the UC's conversation moved to a private message within the Session[1] application. During their communications, they discussed the purported sexual abuse of their daughters and their sexual interest in children. Mr. Kline sent the UC nonsexual images of his purported 15-year-old daughter, who was later verified as his stepdaughter. He subsequently sent the UC two photos and five videos depicting child sexual abuse material (CSAM). Two of the videos were noted to depict the sexual abuse of a prepubescent female by an adult male.

According to the Presentence Investigation Report (PSR), on July 2, 2025, law enforcement executed a search of Mr. Kline's residence in Lancaster, Pennsylvania. A forensic examination of his devices that were seized during that search determined that between June 26, 2025, and July 2, 2025, Mr. Kline had distributed files depicting the child sexual abuse material (CSAM). It was further determined that he had engaged in online communications with other individuals discussing the sexual abuse of minors, and had distributed non-CSAM photographs of his step-daughter during the course of some of those conversations. Mr. Kline has remained in custody since his arrest on July 2, 2025.

Mr. Kline has no history of arrest or conviction as a juvenile or any other adult criminal history separate from the current charges. At the time of his arrest, he was employed by AED Energy Services and living in Sinking Spring, Pennsylvania, with his wife, Michelle, their son, Parker, and his stepdaughter (M.H.). Mr. Kline has another son, Landon, from his first marriage.

---

[1] Session is an end-to-end encrypted messaging application that allows users to transmit and receive messages, photos, videos, either privately or within a group format.

## RELEVANT HISTORY

*Developmental History*

Mr. Kline was born and raised in Allentown, Pennsylvania, to Robert Kline and Linda Fosburg. He is the only child of their union and lived in a two-parent household until the age of four or five, when his parents divorced due to his mother's substance addiction. Following the divorce, his mother retained primary custody, with visitation with his father every other weekend. Mr. Kline recalled positive and meaningful experiences with his father during weekend visits, stating, "It was good, he did a good job making the weekends for us. He spent time with me, and we went to the beach in the summer." In 1991, when Mr. Kline was approximately six years old, both parents remarried; his father married Crystal, and shortly thereafter, his mother married Tim.

Mr. Kline described visitations to his father's and Crystal's home as "difficult," stating that Crystal showed him little warmth or affection. "She didn't care for me. I often felt alone and didn't have anybody to really be with; I felt like I was in the way a lot." His father and Crystal had a son, Richard, before they divorced in 1995. Mr. Kline reported having a positive relationship with Richard throughout their youth. As an adult, Richard struggled with substance addiction, and around 2021, while living with Mr. Kline and his family, he relapsed, engaged in theft, and subsequently moved out of the home. He reported that he asked Richard to leave due to concerns about ongoing substance use while his own child was present, and that this was their last contact prior to Richard's death. Richard died in 2021 from a drug overdose.

In describing his early developmental environment, Mr. Kline recalled early memories of feeling loved by his mother, but described his childhood as marked by fear, confusion, and instability due to exposure to domestic violence and neglect. Following his parents' divorce, he witnessed his mother being physically assaulted by multiple partners, including Tim. Mr. Kline stated, "She tried to stop it or get me to go away, so I wasn't exposed to it… I will never forget watching Tim beat my mom; I was so scared, and I didn't know what to do; I was seven." When Mr. Kline was eight years old, his mother and Tim separated, and she entered a six-month drug rehabilitation program. During that time, Mr. Kline lived with his father for approximately one year before returning to his mother.

At the age of nine, Mr. Kline returned to live with his mother, who was sober and residing in an apartment. Shortly thereafter, she relapsed, and he became aware of her substance use, though he did not understand its severity. "Between the ages of nine and 13, he experienced chronic fear and uncertainty because he was often left alone while his mother obtained drugs. He recalled,

> One time, the police showed up when she didn't pay for a taxi, and since then, she began taking me with her to get drugs. She would leave me in the car while she ran in, and I remember being scared and hiding under the dash. I told her about it, and she eventually began taking me into the buildings… It was scary.

Following these experiences, Mr. Kline reported that he continued to accompany his mother

several times per week for approximately another year, until she lost the apartment and their vehicle became inoperable.

During the fifth and sixth grades, Mr. Kline reported increased awareness of the instability associated with his mother's substance use, including her fabrication of a cancer diagnosis and deceptive behaviors to obtain money from his grandmother. He described being largely responsible for himself, including preparing meals and getting to school independently, as his mother was frequently absent or asleep. Mr. Kline reported feeling persistently alone and unsupported at home and school, with increasing self-consciousness about his appearance, lack of lunch money, and anxiety regarding his school performance (see Academic History).

Although Mr. Kline continued visiting his father regularly, he reported that his father was unaware of the extent of his mother's substance use or the conditions he faced, as Mr. Kline did not disclose them. After being retained in the sixth grade and becoming increasingly aware of the instability in his mother's household, he requested to live with his father full-time, despite reporting that the decision was difficult and that he did not want to leave his mother. His mother subsequently entered residential treatment for approximately one year, while Mr. Kline continued to reside with his father and his father's third wife, Barbara, whom he described as "like a mom" to him.

Following completion of rehabilitation in 1999, Mr. Kline's mother married her third husband, Charlie, whom Mr. Kline recalled positively, stating, "He taught me a lot and loved me. He included me in stuff, and we went on vacations together." He reported that his mother later used alcohol to cope with marital discord, which led to Mr. Kline, then 17, admitting her to a rehabilitation program, which she successfully completed. Charlie died in 2010, and while his mother did not remarry, she is currently in a relationship. Mr. Kline maintains regular contact with his mother, speaking approximately three times per week.

*Academic and Employment History*

Due to family instability, Mr. Kline attended five primary schools before moving in with his father during his second sixth-grade year. He completed his secondary education in the Exeter Township School District, graduating from Exeter Township Senior High School in 2004. Mr. Kline denied any learning disabilities but reported academic challenges related to poor attendance and limited educational support, which resulted in retention in the sixth grade. He stated, "I was on my own. I didn't have anyone to help me with my homework or tests; I failed a lot and was scared all the time that I was going to get into trouble. I hated going to school."

After moving in with his father at age 13, Mr. Kline reported improved academic performance and stability. He described his early peer relationships as primarily with students who were similarly isolated or neglected, though they were not always positive influences. However, following the move, he established a supportive group of friends. Mr. Kline denied experiencing significant bullying or disciplinary actions during his school years. At the age of 15, Mr. Kline obtained his first job as a busboy at Olde Mill Inn, where he worked for approximately six

months, and continued working throughout high school. In 2003, he began summer work with Greth Homes, a residential construction company.

Following high school, Mr. Kline enrolled at the University of Pittsburgh in a science and computer science program, but withdrew after two years due to difficulties with the math courses and homesickness, stating, "I missed my dad; I always considered him my best friend." He returned home in 2006, resumed work with Greth Homes, and enrolled in the business program at Penn State Berks, but left after one year when he decided it was not his preferred educational path. In 2007, Mr. Kline enrolled in Berks Career and Technology Center's 27-month Drafting Design Technology night program. That same year, he left Greth Homes to work as a draftsman at Worley Parsons, an engineering firm for power plants. Mr. Kline was later promoted to Principal Mechanical Designer and remained with the company until 2018, when he accepted a position as a Mechanical CAD Manager with AED Energy Services, where he worked until his arrest in July 2025.

*Medical and Mental Health History:*

Mr. Kline is unaware of any gestational or early developmental complications. Although he was exposed to domestic violence and parental substance use, resulting in significant housing instability and emotional neglect during his formative years, he denied experiencing direct verbal, physical, or sexual abuse. He denied any history of major childhood medical conditions and currently reports being in overall good health.

Mental Health History: Mr. Kline reported that from approximately ages four to 13, while living with his mother, his childhood was characterized by exposure to parental substance use, domestic violence, and chronic instability. During this period, he frequently felt scared due to being left alone for extended periods and from witnessing verbal and physical altercations involving his mother and her partners. Although he denied being directly abused, Mr. Kline recalled regularly overhearing and witnessing violence, stating, "I would usually hide behind a corner or wall somewhere. There was a lot of arguing all the time." He also reported feeling unwanted and unloved during much of his childhood, a sentiment that was compounded by feeling emotionally rejected by his first stepmother during visits to his father's home, despite the absence of violence there.

When reflecting on his early childhood, Mr. Kline described a shift in emotional awareness over time, stating, "I feel like when I was younger, I had a good childhood. My mom still found time for me, and I didn't know what was going on. As I got older, around nine or 10, I started realizing things, and I was sad a lot, but it was still my mom, and it was hard to want to leave." He reported that during this period, he often suppressed his distress and refrained from disclosing his circumstances out of fear of further rejection or losing his relationship with his mother. This pattern contributed to an early tendency to internalize emotional distress rather than seek support. At age 13, Mr. Kline reported that escalating loneliness and emotional distress contributed to his decision to request to live with his father full-time, despite difficulty leaving his mother. He stated that the transition provided increased stability and was associated with a noticeable improvement in his mood, sense of emotional security, and school experience.

As an adult, Mr. Kline reported intermittent experiences of loneliness during periods of transition. While attending college, he stated that, despite having friends, he felt emotionally disconnected, which ultimately led him to return home; after that, his mood improved. He denied experiencing persistent mood or anxiety symptoms during this period. Mr. Kline reported a recurrence of emotional distress in the context of marital stressors. Leading up to his divorce from his first wife, Tare, in 2013, he experienced situational sadness and feelings of inadequacy when she chose to end the marriage. Mr. Kline described this as a period of grief lasting several months and acknowledged that he quickly entered another relationship to avoid feelings of loneliness and perceived unlovability.

In 2016, Mr. Kline met his second wife, Michelle, and reported that they generally had a positive relationship. However, he stated that both avoided confrontation and struggled with communication (see Relationship History). He denied experiencing significant mood-related symptoms until 2023, when he described their relationship becoming emotionally distant, accompanied by a decline in affection and intimacy. Mr. Kline stated, "The more I was denied that emotional connection, the harder it became for me. My mind would go to negative places—I'm not good enough, she really doesn't love me, what did I do wrong." He further reported hesitancy in expressing his needs, stating, "I was afraid if I spoke up, she would then realize she didn't love me or want me as my first wife did."

During this period, Mr. Kline reported experiencing prominent depressive symptoms, including loss of interest in previously enjoyed activities, social withdrawal, insomnia, gastrointestinal distress, and a persistently depressed mood accompanied by intrusive, self-deprecating, and catastrophizing thoughts, including, "My family would be better off if I'm not here." Mr. Kline also reported increased anxiety characterized by rumination over negatively perceived interactions and situations. Family members observed his distress and encouraged him to seek professional help.

In late 2023 or early 2024, Mr. Kline sought outpatient mental health treatment at Furnace Creek Counseling in Robesonia, Pennsylvania. He engaged in biweekly individual therapy with Tom Adel for approximately four months.[2] According to Mr. Kline, Mr. Adel believed his symptoms had improved sufficiently to discontinue treatment; however, Mr. Kline elected to continue treatment and transferred care to Licensed Professional Counselor (LPC) Don Swartz, who attended biweekly sessions for an additional two months. Treatment was later interrupted and discontinued due to changes in Mr. Kline's work schedule, which required frequent travel, resulting in increased loneliness and a subsequent decline in mood.

Mr. Kline stated that he initially sought treatment, believing, "I thought my life was in a bad place because of stress and anxiety. I was really able to help myself identify my feelings through CBT and mindfulness." However, as occupational demands increased and his depressive symptoms intensified, he reported a corresponding increase in the frequency of his use of adult pornography (see Sexual History). Mr. Kline stated that over time, this behavior became

---

[2] Mental health records were not available at the time of this report's preparation; therefore, licensing information for Mr. Kline's first mental health therapist, Tom Adel, could not be obtained.

increasingly maladaptive and transgressive, ultimately contributing to the behaviors underlying the instant offense (see Amenability to Treatment).

Since becoming incarcerated on the instant offense, Mr. Kline reported, and transcript records confirm, that he has participated in and completed 50 courses, 16 of which appear to address personal insight, behavioral change, and recovery. He also reported utilizing available self-help books to address mood-related symptoms and better understand the circumstances that led to his legal involvement. Mr. Kline described learning to apply cognitive-behavioral techniques (CBT)[3] more effectively, which has helped him identify and reflect on his thoughts, emotions, and behavioral patterns. He stated previously having focused primarily on recognizing negative thoughts, but during periods of heightened stress and depressive symptoms, he struggled to identify the maladaptive behaviors he used to cope. As Mr. Kline described, "Mostly it was the awareness of me having negative thoughts and going to that place. It helped me refocus those thoughts."

Additionally, Mr. Kline reported greater awareness of how childhood trauma shaped his emotional and behavioral responses as an adult. He said, "I truly feel that believing I was unwanted and unloved led to what happened [instant offense]. … I learned how to forgive my mom, myself, and the guilt for my brother's death. I feel like I am in a good place now emotionally." Mr. Kline also learned healthier coping strategies in these programs, including journaling, meditation, and Christianity, which he uses to stay focused during stress and anxiety, stating, "It helps me release the things I can't control. I do Bible study every night."

Substance Use History: Mr. Kline reported first drinking alcohol at 16, socially on weekends during high school. He stated his alcohol use increased in college, then slowed by age 21 to about once a month, typically to intoxication. He commented, "I don't drink a lot, but when I do, I get drunk." He denied hazardous or problematic alcohol use beyond this pattern. Regarding marijuana, Mr. Kline tried it at 19 but said he smoked only three times and did not continue. He denied other illicit or prescription drug misuse, with no evidence to suggest otherwise.

*Sexual and Relationship History*

Mr. Kline identifies as a heterosexual male. While growing up, sex was not a topic discussed in his family home. He recalled first learning about the concept of sex and sexual acts at the age of eight, while at a friend's house, where the friend's parents subscribed to the Playboy Channel. He reported that he and other friends visited this home weekly for several months to view this content. He stated that he did not continue viewing pornography following this period. Mr. Kline reported beginning masturbation at the age of 12, initially to the physical sensation of the act, occurring approximately once daily to twice weekly, which continued until he was 14 years of age.

---

[3] Cognitive Behavioral Therapy (CBT) is an evidence-based psychotherapeutic approach that focuses on identifying and modifying maladaptive thoughts and behaviors to improve emotional regulation and adaptive coping.

Around that time, he entered his first romantic relationship, noting that although the relationship was not sexually active, he masturbated approximately twice weekly, which remained consistent into adulthood. Mr. Kline stated that during periods of relationship or marital discord, the frequency increased to daily, and that by 2024, his masturbatory and online sexual behaviors progressively escalated to three to six times per day in the months preceding his arrest on the instant offense. He denied masturbating since becoming incarcerated.

Regarding pornography use, Mr. Kline reported first learning about online pornography at age 15 through discussions with friends. While at his father's home, where he had computer access, he began searching for pornography online by entering the term "sex" into Google search and selecting free websites from the search results. Mr. Kline reported that he subsequently began regularly viewing adult pornography while masturbating. As an adult, he stated that he viewed free, consensual online pornography primarily from xHamster.com or Pornhub.com, selecting content from predefined categories, including "teen (18 to 19-year-olds)," "feet," and "threesomes." Mr. Kline reported a consistent interest in content depicting feet but denied a general preference for amateur versus professionally produced material. When asked about his sexual attraction, He described women with an "average body type."

While discussing these themes, Mr. Kline reported that at approximately age 16, while dating his then-girlfriend, Aleks, she at times used her feet for sexual stimulation (footjobs).[4] He acknowledged a persistent sexual interest in feet since that time, but clarified that such content or activity was not required for sexual arousal or orgasm. Following this experience, he began viewing foot-related pornography. Mr. Kline reported using masturbation and pornography as coping mechanisms during periods of negative mood, and following the onset of a depressive episode in 2024, he reported an increase in these behaviors to three to five times daily. He stated that in approximately March or April 2025, while using the xHamster website, he began commenting on videos and engaging in private messaging with other users. Through these, he reported learning about FetLife.com and LuxureTV.com.[5]

> A **kink** refers to a sexual interest or activity that deviates from traditional or normative sexual practices, which can include a wide range of behaviors, such as role-playing, bondage, or power dynamics. A **fetish**, by contrast, involves an intense fixation on a specific object, material, or body part that is essential or highly significant to an individual's sexual arousal and satisfaction. While both kinks and fetishes fall under the broader umbrella of non-normative sexual interests, the distinction lies in the degree of necessity: a kink may enhance sexual experiences, whereas a fetish often plays a more central and sometimes indispensable role in sexual fulfillment.

Mr. Kline reported that he primarily frequented FetLife, not to view pornographic content, but for the social interaction through the sexually-themed groups. He stated, "I attribute it to not having anybody to turn to or talk to and there were people I could have a friendship with and I could talk to about life that was similar to me—having a family, kids, work; it wasn't only sexual

---

[4] A footjob is a sexual act in which one person uses their feet to sexually stimulate or masturbate another person's genitals.
[5] FetLife and LuxureTV are platforms that cater to individuals who have an interest in alternative sexual practices and fetish-related content.

but turned to that." Mr. Kline joined "foot fetish" groups and groups with local members, and though these interactions, he learned about the messaging application, Session.

> ### Incest Play / Family Play
>
> Incest or family play refers to sexual role-playing scenarios in which participants explore and imitate familial or caregiving roles associated with family relationships. During family play, participants may assume the roles of relatives or address one another using familial terms such as "mommy" or "daddy." Role-play may also include nurturing behaviors (e.g., suckling at a breast) or verbal affirmations (e.g., "you're a good boy/girl").
>
> **Psychological Mechanisms:** Arousal associated with family play may stem from multiple, overlapping psychological mechanisms. These can include the taboo or prohibited nature of incest; the symbolic experience of closeness, safety, or attachment; the reenactment of caregiving or dependency dynamics; and the use of structured roles that reduce interpersonal ambiguity. For some individuals, these dynamics may temporarily meet unmet emotional or attachment needs or provide a sense of validation, control, or belonging.
>
> **Clinical Context:** When practiced between consenting adults, family play represents a fantasy-based sexual interest and does not, in itself, indicate a propensity to engage in incest or sexual harm toward real-life family members. Clinical concern may arise if such behavior involves actual relatives, becomes compulsive, or interferes with normative sexual functioning, emotional regulation, or interpersonal relationships.

Mr. Kline reported that during a conversation on Session with a member from FetLife, he was introduced to the incest genre through discussion and engagement in role-play. He subsequently joined incest-themed groups on FetLife, where members discussed their sexual preferences in the context of their life experiences. Mr. Kline stated, "There were a lot of people that experienced the same day-to-day stresses as I did," and the nonsexual relatability of personal experiences was what drew him to the group. He acknowledged taking part in the incestual roleplays under the "dad" persona. Mr. Kline reported that his involvement in the roleplays facilitated a sense of connection with other group members through relationships based on shared and simulated experiences. He further reported that the intimacy generated through these roleplays fulfilled longstanding emotional deficits from childhood—specifically feeling wanted, loved, needed, and cared for—which he experienced as emotionally gratifying and sexually arousing.

Approximately two months after joining FetLife and becoming involved in the incest groups, Mr. Kline began communicating with a member via Session. During one conversation, he first encountered child sexual abuse material (CSAM) after an image was sent to him. He stated, "I immediately did not care for it; it was not what I wanted, and I said I wasn't interested in that. I stopped talking to that particular person for about a week, but I missed the relationship. I reached out to that person, and we continued talking about the incest fantasy." In later conversations, the individual sent a second image depicting what appeared to be a naked 16-year-old female.

Thereafter, many of the role-plays involved adolescent females, which he described as, "That was intriguing because it was something new and more acceptable because she was a teenager

and developed." He reported that it was his engagement in these online conversations and exposure to CSAM that ultimately led to his involvement in the instant offense and subsequent conviction of Distribution of Child Pornography.

When asked to describe any other sexual activities he may have engaged in, Mr. Kline denied engaging in transgressive sexual behaviors (e.g., prostitution, patronizing sex clubs, or exhibitionism). He denied fantasizing, becoming aroused, or engaging in voyeuristic activities on unsuspecting persons for sexual gratification. He denied being aroused by causing physical or psychological pain to a sexual partner or being aroused by being hurt during sex (e.g., sexual sadism, dominance, masochism, or bondage). Mr. Kline acknowledged that his engagement in online sexual conversations to cope with loneliness and negative emotions was a prominent coping strategy.

When asked about his self-perception regarding the intensity or prominence of his sexuality, Mr. Kline acknowledged having had seven sexual partners, all of whom were intimate partners. He reported his first intimate relationship at age 16 with Michelle, a friend of his sister, which lasted six to seven months. Also at 16, he dated a classmate, Alexs, for approximately three years until graduation. Mr. Kline identiMr. Kline identified three significant adult relationships: the first, at age 19, with Brittany, which lasted a year and a half. Then, he began dating Tara, whom he met in college. They dated for six months before living together with Tara's then-three-year-old daughter, Rilee. They married in 2010 and had a son, Landon (age 13). They divorced in 2013, which Mr. Kline attributed to their young age, but he noted that they remained friends and that Tara continues to be a significant source of support.

In October 2015, Mr. Kline met Michelle on the dating platform Match.com, and they dated for approximately one year before cohabitating. They married in June 2017 and had a son, Parker (age 6). Michelle has a daughter, M.H. (age 16), from a previous relationship, who also lived with them. Mr. Kline reported having always maintained a positive, emotionally close relationship with all of his children, stating, "I had a hard time letting my kids grow up."

When asked about the quality of his marriage and sexual intimacy, Mr. Kline described a positive and emotionally close relationship but acknowledged that communication was poor. He reported learning through conversations with Michelle, since becoming incarcerated, that the emotional distance he had attributed to a lack of love was instead related to her postpartum depression following Parker's birth. Regarding sexual intimacy, Mr. Kline reported that intercourse initially occurred one to two times per month and declined to one to two times per year after marriage and Parker's birth. When asked about satisfaction with the frequency and quality of intimacy, Mr. Kline stated, "Once or twice a month was okay; I preferred that it was more, but it was enough, and it was good as long as there were other forms of affection going on. It doesn't have to be sexual, but intimate. I like the close bond and feeling loved."

**FINDINGS**

Mental Status and Behavioral Observations: Upon interview, Mr. Kline was alert, attentive, and

oriented in all spheres. His speech was clear and coherent, with normal rate, rhythm, and volume. Intelligence seemed to be in at least the Average range, as evidenced by his vocabulary and his capacity for conceptual thinking. Memory for recent and remote events was generally intact. He was able to focus and attend during the evaluation without the need for redirection. Emotional expressions were variable within a normal range. There were no indications or endorsements of the severe symptoms of major mental illness (e.g., hallucinations, delusional beliefs, paranoia, etc.). He denied past or current homicidal thinking, attempts, or intentions to harm others, and he denied current suicidal ideation or thoughts of harming himself. Mr. Kline's manner of relating was polite and cooperative, answering all questions and elaborating with more detail when prompted.

Diagnostic Formulation – the Relevance of Trauma: During this evaluation, Mr. Kline described a developmental history marked by early and prolonged exposure to adverse childhood experiences, including parental substance use, domestic violence, emotional and physical neglect, and housing instability. These conditions resulted in chronic fear, confusion, and emotional insecurity throughout childhood and contributed to an early reliance on emotional avoidance and self-containment as primary coping strategies. Specifically, Mr. Kline developed a flight-based response characterized by suppression of emotional distress and avoidance of disclosure out of fear of rejection or abandonment.

Throughout his youth, Mr. Kline's father served as a meaningful protective buffer, and residing with him during a period of heightened emotional vulnerability provided increased stability and security. However, because his earlier traumatic experiences remained largely unprocessed, this protective environment also reinforced emotional avoidance rather than emotional integration (van der Kolk, 2005).[6] Consequently, when triggered—particularly within intimate or emotionally salient relationships—this pattern is associated with intensified distress, heightened sensitivity to perceived rejection, and activation of a self-deprecating internal narrative, increasing vulnerability to maladaptive coping responses (Howard et al., 2023).[7]

In the period preceding the instant offense, this longstanding defensive pattern appeared to become destabilized by the convergence of relational and occupational stressors. Mr. Kline described increasing emotional distance within his marriage, which, when combined with escalating work-related demands and associated loneliness, triggered trauma-related themes of being unwanted and unloved. This activation was accompanied by the emergence of prominent depressive symptoms that became increasingly difficult to regulate. In the absence of more adaptive coping strategies, Mr. Kline became more inclined to engage in self-gratifying and problematic behaviors that provided short-term emotional relief despite foreseeable long-term consequences, including high-risk sexual behaviors (Gewirtz-Meydan et al., 2025; Tull & Gratz, 2013). In this context, Mr. Kline's engagement in solitary and online sexual behaviors functioned

[6] van der Kolk, B. A. (2005). Developmental trauma disorder: Toward a rational diagnosis for children with complex trauma histories. *Psychiatric Annals, 35*(5), 401–408. https://doi.org/10.3928/00485713-20050501-06
[7] Howard, A., Gwenzi, G. D., Taylor, T., & Wilke, N. G. (2023). The relationship between adverse childhood experiences, health, and life satisfaction in adults with care experience: The mediating role of attachment. *Child & Family Social Work, 28*(3), 809–821. https://doi.org/10.1111/cfs.13006

as an affect-regulation strategy and contributed to impaired judgment, culminating in the instant offense.

<u>Diagnostic Impressions</u>: Although Mr. Kline experienced persistent trauma throughout childhood, he did not report a longstanding pattern of post-traumatic stress symptoms. Instead, his clinical presentation was characterized by prominent mood-related symptoms that fluctuated in severity in response to relational, occupational, and situational stressors. At various points in his life, these symptoms were consistent with Persistent Depressive Disorder[8] and Major Depressive Depressive Disorder, with the most recent onset of a depressive episode occurring in 2023. At the time of this evaluation, Mr. Kline reports being emotionally stable, with mood largely regulated and adaptive coping strategies in place (e.g., journaling, meditation, religious practices, CBT-informed strategies). At this time, Mr. Kline did not endorse, nor did he present with, symptoms sufficient to meet DSM-5-TR criteria for any current psychiatric disorder. He also does not meet diagnostic criteria for any personality disorder.

Overall, Mr. Kline demonstrates adaptive functioning in work, family, and social relationships, reflecting resilience and prosocial engagement. His history suggests that mood-related dysregulation arises primarily in the context of stress or perceived interpersonal neglect, highlighting the situational nature of his difficulties rather than a pervasive psychiatric disorder.

<u>Psychosexual Functioning</u>: Mr. Kline was open to discussing his sexual history and preferences, and described a long-term pattern of sexual interest in and relationships with adult women. His sexual development and partnered sexual functioning have been normative and are not indicative of sexual preoccupation or hypersexuality, as evidenced by the absence of anonymous or casual sexual encounters and a sexual history limited to a small number of committed relationships. Periods of increased solitary sexual activity occurred in the context of mood disturbance and functioned as a coping response rather than a pervasive pattern of sexual preoccupation or compulsive sexual behavior.

In evaluating the diagnosis of a Paraphilic Disorder, both Mr. Kline's past and recent behaviors were thoroughly considered, including his sexual preferences and the extent of child sexual abuse material (CSAM). Mr. Kline acknowledged a long-standing sexual interest in and arousal to feet, but reports that this interest is consensual, non-compulsive, and does not cause distress or impairment in his daily life. Therefore, this interest does not meet the threshold for a fetishistic disorder.

More recently, Mr. Kline engaged in incest-themed online role-plays, reflecting non-normative sexual behavior occurring within adult, consensual contexts. Such role-play, in isolation, does

---

[8] According to the Diagnostic and Statistical Manual of Mental Disorders, fifth edition, Text Revision (DSM-5-TR), Persistent Depressive Disorder is a mood disorder whereby a person has experienced a depressed mood more days than not for a period of at least two years. While depressed, they experience two or more symptoms of the following: insomnia/ hypersomnia, alterations in appetite, hopelessness, low self-esteem, fatigue, and difficulty concentrating or making decisions. However, when a person's symptoms are sufficient for a diagnosis of a major depressive episode, then a separate diagnosis of Major Depressive Disorder should be added. (American Psychiatric Association, 2022)

not indicate a paraphilic disorder or a propensity for real-world incestuous behavior. Mr. Kline reported that these interactions fostered a sense of connection with other participants and temporarily addressed longstanding emotional deficits related to childhood experiences. Although concerning when viewed in the context of the instant offense, engagement in atypical sexual role-play with consenting adults is not considered sexually deviant or pathological in the absence of compulsivity, functional impairment, or involvement of real family members. By contrast, online communications involving the purported sexual abuse of minors do not constitute role-play when child sexual abuse material is distributed.

### Paraphilia

According to the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (DSM-5-TR),

The term paraphilia denotes any intense and persistent sexual interest other than sexual interest in genital stimulation or preparatory fondling with phenotypically normal, physically mature, consenting human partners... Some paraphilias primarily concern the individual's erotic activities, and others primarily concern the individual's erotic targets…A paraphilic disorder is a paraphilia that is currently causing distress or impairment to the individual or … has entailed personal harm, or risk of harm, to others (pp. 779-780).

### Pedophilic Disorder

A diagnosis of Pedophilic Disorder requires all of the following criteria to be met:
a.   Over a period of at least six months, recurrent, intense, sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age thirteen years or younger).
b.   The individual has acted on these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty.
c.   The individual is at least sixteen years and at least five years older than the child or children in Criterion A.

### Other Specified Paraphilic Disorder

The use of Other Specified Paraphilic Disorder applies to presentations in which symptoms characteristic of a paraphilic disorder that causes clinically significant distress or impairment in social, occupational, or other important areas of functioning predominant but do not meet the full criteria for any of the disorders outlined within the paraphilic disorders diagnostic class. The other specified paraphilic disorder category is assigned when the clinician chooses to communicate the specific reason that the presentation does not meet the criteria for any specific paraphilic disorder. The presentation being specified includes, but are not limited to,

    a.   Over a period of at least six months, recurrent, intense, sexual arousal involving, in this
        case pubescent females

> b.  And causes marked distress or interpersonal or impairment in social, occupational, or other important areas of functioning to the individual with the paraphilia or whose satisfaction has entailed personal harm, or risk of harm, to others

There is no indication that Mr. Kline exhibited a pervasive sexual interest in or preference for prepubescent or pubescent females prior to the instant offense. According to the PSR, law enforcement extracted Mr. Kline's devices and found that he had engaged in online conversations regarding the sexual abuse of children, including distributing non-CSAM photographs of his stepdaughter during some exchanges. The timeframe of these communications was not initially specified. Mr. Kline's engagement in these non-normative online behaviors appears to have emerged in the context of persistent loneliness and depressive symptoms beginning in 2023.

Available information suggests that Mr. Kline's primary motivation for participating in non-normative sexual dialogues was the pursuit of emotional connection rather than sexual interest in minors. Mr. Kline did not report an ongoing pattern of such dialogues or use of CSAM for sexual gratification, nor is there evidence that he attempted to meet anyone in person to commit sexual abuse. While involvement with fictional sexual stories or CSAM is deviant and could suggest a pedophilic interest, "such behavior in the absence of the individual's sexual interactions with children (i.e., acting on these sexual urges in person) is insufficient to conclude that Criterion B [for Pedophilic Disorder] is met" (American Psychiatric Association, 2022, p. 793).

According to the Statement of Facts, Mr. Kline's online interactions involving CSAM occurred between June 26, 2025, and July 2, 2025. This short duration and the limited amount of child sexual exploitation material involved—5 videos and 2 images—do not indicate a persistent sexual interest in minors. Individuals with more extensive collections of child sexual exploitation material are more likely to demonstrate such a pattern. Based on the available information and consistent with DSM-5-TR criteria, Mr. Kline does not meet the diagnostic criteria for Pedophilic Disorder.

While Mr. Kline engaged in online conversations that included discussions involving the purported sexual abuse of his adolescent stepdaughter (M.H.) and the distribution of non-CSAM images, these behaviors occurred over a circumscribed period. There is no evidence of a persistent sexual interest in early adolescents. Furthermore, sexual attraction to a minor female over the age of 13 is not inherently indicative of a deviant sexual interest, as most individuals at this age exhibit signs of pubertal development (e.g., breast development, pubic hair). Based on the available information, his behaviors do not meet the DSM-5-TR criteria for Other Specified Paraphilic Disorder: Hebephilic Disorder, as there is no indication of a long-standing, recurrent pattern of sexual arousal toward early adolescent females.

<u>Instant Offense and Amenability to Treatment</u>: Mr. Kline discussed the behavior that underlies the instant offense. His account of the offense behavior was consistent with official accounts. Mr. Kline displayed credible remorse while discussing these matters. When asked about the CSAM discovered on his devices, Mr. Kline stated that the files had been uploaded by another

user in the Session application and that he had forwarded them in an effort to establish credibility so the person would be willing to communicate. Within this evaluation, Mr. Kline genuinely appeared to consider his sexual interests and behaviors as they related to his online sexual interactions, including the sexual dialogue he had with the UC.

Mr. Kline reported he was willing to participate in sex offender-specific treatment to address his online sexual behavior. His ability to self-reflect and his candidness about his sexual behaviors demonstrate his motivation to change and a willingness to experience discomfort to bring about personal changes.

*Risk Assessment*

The Child Pornography Offender Risk Tool (CPORT): Version 2: When estimating the recidivism risk for an individual offender, it is typically best to begin by considering group data. In other words, we can make better judgments about an individual offender's recidivism risk if we know the rates of recidivism among similar offenders from the same population. Usually, actuarial measures—developed through research studies that follow large groups of offenders over time while tracking indicators of any new offenses—are useful in providing estimates of re-offense rates among groups of offenders with particular characteristics or risk factors.

The Child Pornography Offender Risk Tool (CPORT): Version 2 was developed to predict all types of sexual recidivism (i.e., contact, non-contact, and child pornography sexual offenses) among men who have been convicted of a child pornography offense. To date, the CPORT is the first specific risk assessment tool for individuals convicted of a child pornography offense. Though preliminary risk estimates (in the form of re-offense rates) have been generated using the CPORT, these estimates/rates have not yet demonstrated sufficient stability across samples to allow for the application of specific numerical risk estimates to individual offenders.[9, 10] In other words, the CPORT has not been sufficiently validated to support the determination of specific risk levels, or the characterization of relative re-offense risk, for individual offenders.

Because of this, the developers of the CPORT recommend that, at this time, the instrument be used solely to rank offenders according to their relative risk scores to aid in case management, supervision, and prioritizing treatment goals. The factors that have been found to be associated with sexual re-offense among child pornography-only offenders have been specifically defined

---

[9] Eke, Helmus, & Seto (June 2018). Child Pornography Offender Risk Tool (CPORT) Scoring Guide for CPORT V2 (June 2018 Version).

[10] The CPORT still does not have the extensive validation found with more established risk tools (i.e., Static-99R). Therefore, the authors of the CPORT do not recommend the actuarial use of the CPORT with reference to the recidivism probabilities at this time. (Eke, Helmus, & Seto, June 2018).

and operationalized in the development of the CPORT.[11, 12] Factual information about the offenders' personal and criminal history, in addition to information about the type of detected child pornography material, allow the evaluator to code the presence/relevance of the seven CPORT risk items, resulting in a total score or percentile that describes how an individual's score compares to the scores of other offenders. Specifically, the proportion of individuals expected to have the same score, as well as a higher and a lower score than the offender being assessed.[13]

On the CPORT, Mr. Kline scored 0 out of 7 points. No risk factors were identified during CPORT scoring. The observed percentages from the combined normative dataset indicate that 0% of individuals had a lower CPORT score, 18% had the same score, and 82% had a higher CPORT score than Mr. Kline. The relevance of these factors for Mr. Kline is delineated here:

- Young age at the time of the first offense.

    *Mr. Kline was 39 years old when the investigation into the instant offense began, which is within the research guidelines as not constituting a young age at the time of the first offense.*

- Prior criminal history, including non-sex offense criminal history.

    *Mr. Kline has no criminal history.*

- Any history of contact sexual offending.

    *Mr. Kline has no known history of contact sexual offending.*

- The CPORT factor, "Indication of pedophilic or hebephilic interests," pertains to the disclosure/admission or diagnosis of sexual interest in children or adolescents.

    *Separate from the instant offense, there is no indication that Mr. Kline has a sexual interest in or preference for prepubescent or pubescent minors.*

---

[11] The risk factors that are assessed within the CPORT include: a) Age 35 or younger at index offense; b) Any prior criminal history; c) Any prior contact sexual offense history; d) Any conditional release failure; e) Admission of pedophilic or hebephillic (sexual interest in pubescent children); f) Greater content featuring boys as compared to girls in child pornography viewed/possessed; and g) Greater content featuring boys as compared to girls in other child materials.

[12] According to the CPORT developers, the "Relative distribution of child age in the child pornography images (categorized as infant/toddler, prepubescent, or pubescent) did not predict sexual recidivism and thus was not included in the CPORT." (Eke, Helmus, & Seto, June 2018, p. 39).

[13] The CPORT development sample was comprised of two hundred sixty-six adult male offenders who had received child pornography convictions in Canada. The sample as a whole demonstrated the following recidivism rates: (1) Any offense: 29%; (2) New Sexual Offense: 11%; (3) New Contact Sexual Offense Against a Child: 3%; (4) New Child Pornography Offense: 9%. Overall, child pornography-only offenders with no other criminal history receive lower scores on the CPORT, which corresponds with lower observed rates of recidivism.

- Antisocial characteristics. Individuals with antisocial traits exhibit a lifelong pattern of violating rules with little regard for the impact of their behavior on others. They tend to behave impulsively and irresponsibly, often with substantial aggression.

> *Mr. Kline does not exhibit behaviorally significant antisocial characteristics.*

In addition to actuarial risk level assessment based on static variables, it is important to consider dynamic variables and how they may modify an individual's reoffending risk (collectively referred to as criminogenic needs[14] in the correctional and social science literature). Whereas static risk is an unchangeable, long-term measure, dynamic risk factors are related to current psychological, interpersonal, and sexual factors relevant to an individual's risk and are amenable to change and treatment interventions. The dynamic risk factors not assessed by the CPORT have been identified that tend to distinguish recidivist child pornography offenders from non-recidivists. The relevance of these factors to Mr. Kline is delineated below, beginning with the need area warranting clinically significant concern.

- An offender's ability to maintain secure intimate adult relationships, identifying the presence or absence of an intimate relationship, and the quality, nature, and duration of that relationship.

> *As a result of the instant offense, Mr. Kline's wife, Michelle, has filed for divorce. He has otherwise been able to maintain stable relationships.*

- All sexual offenders have engaged in deviant sexual behavior. Still, not all sexual offenders have deviant sexual interests. This item pertains to the disclosure/admission or diagnosis of sexual interest in children or adolescents.

> *Although Mr. Kline's participation in online sexual communications involving the sexual abuse of minors and his distribution of CSAM are considered deviant, there is no indication that those interactions have extended into contact offenses against a minor. There is also no indication that Mr. Kline has a persistent sexual interest or preference for minor males. However, He did identify feet as a kink and has engaged in non-normative sexual online activities (i.e., incest role-play).*

- Some sexual offenders think about sex or engage in sexual activity to manage emotions. The sexual thoughts or behaviors may be either normative or deviant. The key is that the offender relies on sex to self-soothe or mitigate unwelcome feelings of tension, anger, hostility, or anxiety. Many non-offenders engage in sexual thoughts and behaviors in response to feelings of boredom or loneliness.

> *Mr. Kline acknowledged engaging in solitary sexual acts and online sexual interactions as a primary coping strategy to relieve stress and self-soothe his*

---

[14] In this context, criminogenic needs comprise dynamic risk factors that directly relate to an individual's likelihood to reoffend and commit another crime.

*negative emotions.*

There were no clinically significant concerns noted in the following areas: Significant Social Influences, Emotional Identification with Children, Hostility Toward Women, General Social Rejection, Lack of Concern for Others, Impulsive Acts, Poor Problem-Solving Skills, Negative Emotionality, Sex Drive/Sex Preoccupation.

Prominent protective factors (factors that would tend to mitigate the risk of reoffending) include the absence of a generally antisocial or criminal lifestyle and a history of compliance with authority. In addition to Mr. Kline's ability to maintain employment and financial responsibility, he has a positive support system and has abstained from drug and alcohol use. Furthermore, Mr. Kline has insight into the correlation between his use of sexual activity as a coping strategy to numb the negative emotions he experienced and has motivation to engage in necessary mental health and sex offender treatment.

## CONCLUSIONS

Mr. Kline's psychosocial and developmental history was marked by early and prolonged exposure to adverse childhood experiences, which contributed to chronic insecurity and the development of avoidant, self-contained coping strategies aimed at managing distress and preserving attachment. While periods of relative stability during adolescence provided important protection, his earlier traumatic experiences were not fully processed or resolved. As a result, Mr. Kline learned to manage distress through suppression and avoidance rather than adaptive processing. This coping style limited his ability to regulate strong feelings and increased vulnerability to significant distress when he perceived rejection, abandonment, or threat within close relationships.

In the period preceding the instant offense, Mr. Kline's longstanding pattern of coping was overwhelmed by a combination of occupational stress, prolonged marital strain, and increased emotional isolation. His tendency toward self-deprecation and fears of abandonment contributed to a downward spiral of depressive symptoms and a reduced ability to cope with emotional distress. Reliance on maladaptive coping strategies intensified, with self-gratifying sexual behaviors serving as a short-term way to manage distress despite foreseeable negative consequences. Viewed within this framework, the instant offense reflects an acute breakdown in coping capacity amid cumulative stressors rather than a fixed or entrenched pattern of deviant sexual interest, and is best understood in the broader context of unresolved trauma, impaired regulation, and situational destabilization.

As indicated by the growing body of research and data on Internet sex offenders, it is increasingly evident that there are distinct differences between online offenders and more traditional contact offenders. Having reviewed Mr. Kline's behavioral and psychosexual history, it appears that his offense conduct in the underlying matter is not consistent with that of a preferential offender with an abiding sexual interest/attraction to minor females. That is, he appears to have a long-term pattern of sexual interest in adult women, not in children or

adolescents. Although Mr. Kline's involvement with child pornography and online communications involving the sexual abuse of children are considered deviant behaviors, such behavior is not necessarily indicative of a pedophilic interest or preference.[15]

Mr. Kline's involvement with CSAM does not reflect a persistent interest or sexual arousal toward minors. Additionally, the limited amount of child pornographic content—5 videos and 2 images—further indicates an absence of a pervasive deviant sexual preference. Mr. Kline did not describe an ongoing pattern of seeking and downloading CSAM for sexual gratification. Instead, Mr. Kline described inadvertently viewing CSAM as part of a pattern of engaging in online sexual communications that became increasingly more transgressive over time. Mr. Kline does not meet the diagnostic criteria for a Paraphilic or Pedophilic Disorder.

Estimating the risk of reoffending among individuals with first-time, child pornography-only convictions is challenging, in part because the overall rate of sexual recidivism in this population is relatively low. Assessment of Mr. Kline's risk for sexual recidivism using the Child Pornography Offender Risk Tool (CPORT) revealed no identifiable static risk factors. As noted above, the CPORT provides a preliminary risk estimate that is not specific to offenders with child pornography-only offenses and does not capture all dynamic risk or protective factors that may be relevant to Mr. Kline. From a clinical perspective, assuming his self-report is accurate, and his involvement with child pornography was limited to a brief period, his risk of committing another non-contact, child pornography-related offense is low, as is his risk of engaging in a hands-on sexual offense.

The dynamic risk factors identified in this evaluation are amenable to mitigation through participation in mental health and sex offender-specific treatment. Such programs could provide Mr. Kline with education, therapeutic support, and coping strategies to help him manage sexual urges, regulate emotions, and refrain from engaging in sexually problematic or deviant behaviors during periods of heightened stress. Mr. Kline's risk of sexual recidivism would be expected to decrease further, provided he participates in treatment and no additional risk factors emerge, regardless of whether he is in the community under supervision or serving a term of incarceration.

From a clinical and risk management perspective, Mr. Kline may be more vulnerable to negative effects from long-term incarceration and exposure to environments dominated by peers at higher risk for re-offense. He appears likely to benefit from structured support and interventions that provide guidance, accountability, and skills to manage risk, and Mr. Kline's general history of compliance with authority suggests he can respond well to programs and external supports aimed at promoting adaptive coping and reducing risk-related behaviors. These considerations further highlight the potential value of mental health and sex offender-specific treatment in addressing dynamic risk factors and supporting positive behavioral outcomes.

---

[15] Seto, Michael. Draft dated February 6, 2012, *Child Pornography Offender Characteristics and Risk to Reoffend*, [Prepared for the United States Sentencing Commission]. Royal Ottawa Health Care Group. www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215/Testimony_15_Seto.pdf

Treatment programs that promote a successful transition to the community are designed to change behavior, thinking, and attitudes known to contribute to criminality. Such programs address the individual's criminogenic needs (dynamic risk factors) that, if changed, reduce the likelihood of future criminal and sexual behavior. If Mr. Kline is to receive a term of incarceration, the Federal Bureau of Prisons (BOP) national reentry programs[16] do offer treatment programs. However, there can be barriers to accessing some of those programs due to the sexual nature of the individual's offense. However, he would benefit from the following recommendations:

1. Mr. Kline would benefit from participating in the Sex Offender Treatment Program – Non-Residential (SOTP-NR), which focuses on addressing dynamic risk factors linked to re-offense in sexual offenders. The program employs cognitive-behavioral techniques and emphasizes skills acquisition and practice. It should be noted that this program is offered in eight institutions across different security levels, typically during the last 36-48 months of an offender's sentence.

2. The BOP's Cognitive Processing Therapy and Resolve Programs utilize a standardized treatment protocol within a group format to address the trauma-related mental health needs of an individual. The Cognitive Processing Therapy program is designed to address symptoms of posttraumatic stress disorder through the combined intervention of "cognitive techniques with written exposure therapy…" (p.22).

   The Resolve Program is designed "to address trauma-related mental health needs of an individual." The Resolve program consists of three components: education, skill building, and Dialectical Behavior Therapy (DBT), as well as Cognitive Processing Therapy (CPT), and a Skills Maintenance Group (p. 41).

3. While Mr. Kline is incarcerated, participating in a mental health treatment program that teaches him effective coping and problem-solving skills would be beneficial. For example, the BOP's Emotional Self-Regulation program would be advantageous, as it uses a cognitive-behavioral approach to help individuals identify emotional and behavioral patterns and develop practical skills to manage distressing emotions.

Recommendations if Mr. Kline is to return to the community under supervised release:

1. Mr. Kline's supervised release plan should incorporate strategies to address his specific dynamic risk factors/criminogenic needs (i.e., mental health, poor problem-solving skills, etc.). Such a plan would not only provide necessary support and accountability around his participation in the forms of treatment but also allow him to complete treatment, both of which would substantially reduce his risk of recidivism.

---

[16] The FIRST STEP ACT Approved Programs Guide (FSA Guide), Federal Bureau of Prisons, Reentry Services Division. Version dated August 2025.

2.  Mr. Kline's participation in an outpatient sex offender-specific treatment program would provide him with support and accountability while on supervised release by establishing a relapse prevention plan that incorporates his criminogenic needs (i.e., sexual activity as coping and deviant sexual behaviors) and that reduces sexual recidivism. For example, a relapse prevention plan may include teaching coping skills to manage his sexual thoughts and urges to refrain from engaging in sexually problematic behaviors.

3.  Mr. Kline would significantly benefit from participating in trauma-informed individual mental health therapy so that he could learn to effectively process painful experiences, improve his self-regulatory capacity, and address his trauma responses in everyday interactions. Treatment would teach him how to manage difficult emotions and recognize his triggers that contribute to a self-destructive cycle. A treatment provider specifically trained in trauma treatment would implement an evidence-based treatment protocol.

The conclusions, opinions, and recommendations presented in this report are based on the information available at the time of its preparation. Should new information emerge from any source, these conclusions, opinions, and recommendations may be reassessed and modified.

Respectfully,

Shauna Keller, Psy.D., CSOTP
Clinical Psychologist
Certified Sex Offender Treatment Provider